UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>    v.<br><br>(1) FRANK ELROY VENNES, JR.,<br>(2) DAVID WILLIAM HARROLD, and<br>(3) BRUCE FRANCIS PREVOST,<br><br>          Defendants. | **INDICTMENT** CR 11-141 JRT/JJK<br><br>(15 U.S.C. § 77q(a))<br>(15 U.S.C. § 77(x))<br>(18 U.S.C. § 2)<br>(18 U.S.C. § 1957) |

THE UNITED STATES GRAND JURY CHARGES:

## INTRODUCTION

The Petters Fraud

1.   Petters Company, Inc. ("PCI") was owned and operated by Thomas J. Petters.

2.   From the late 1990s until in or about September 2008, Petters obtained billions of dollars from investors in exchange for short-term, trade finance, promissory notes issued by PCI ("PCI Notes").

3.   To induce the investment, Petters and PCI represented to investors that funds invested in PCI Notes would be used to finance the purchase of vast amounts of consumer electronics and other consumer merchandise from certain suppliers.  Petters further represented that PCI would resell the merchandise at a profit to certain "Big Box" retailers, including such well-known chains as Sam's Club and Costco.



APR 2 0 2011

U.S. DISTRICT COURT MPLS



FILED **APR 2 0 2011**

RICHARD D. SLETTEN, CLERK

JUDGMENT ENTERED

DEPUTY CLERK'S INITIALS

U.S. v. Frank Elroy Vennes, Jr., et al.

4.     In reality, the transactions underlying virtually all PCI Notes were fictitious. Documents evidencing the purported transactions were fabricated by Petters' criminal associates, and the purported suppliers of the electronic goods were shell companies acting in concert with Petters.     No retailers participated in the transactions underlying the PCI Notes and there were no purchases and resales of consumer electronics or other consumer merchandise.     Instead, Petters diverted hundreds of millions of dollars to his own purposes and paid purported profits to investors with money raised from the sale of new notes.

5.     Petters' inventory finance operation was a Ponzi scheme, which was brought to light after federal agents executed search warrants at Petters' business offices and other locations on September 24, 2008. Petters and several of his criminal associates were convicted and sentenced to imprisonment.

6.     Petters began the PCI Ponzi scheme in or before 1993 and starting in the late 1990s raised most of the proceeds of the fraud by selling PCI Notes to large hedge funds, managed and operated by hedge fund managers.

7.     Hedge fund managers had a fiduciary duty to their investors. Hedge fund managers made representations and warranties to their investors regarding the investments, the due diligence performed on the investments, and the financial mechanisms put in

2

U.S. v. Frank Elroy Vennes, Jr., et al.

place that were designed to protect the hedge fund's investments in PCI. In exchange for their efforts, the hedge fund managers obtained fees from investor funds. Some of these fees were calculated as a percentage of the money invested by those managers' hedge funds in PCI Notes, and some of these fees were calculated as a percentage of trading profits.

### The Palm Beach Funds

8.    Among the hedge funds that invested investor funds in PCI Notes were Palm Beach Finance Partners, LP ("PBFP") and Palm Beach Finance II, LP ("PBFII"), as well as two offshore hedge funds, Palm Beach Offshore, Ltd. ("PBO") and Palm Beach Offshore II, Ltd. ("PBOII") (collectively, the "Palm Beach Funds"). Investors in the Palm Beach Funds included individuals, foundations, family trusts, and other hedge funds.

9.    Palm Beach Capital Management, LP ("PB Management LP"), a Delaware limited partnership, and Palm Beach Capital Management, LLC ("PB Management LLC"), a Florida limited liability company, were co-founded by defendants DAVID WILLIAM HARROLD and BRUCE FRANCIS PREVOST in February of 2000. PB Management LLC served as the investment manager for the Palm Beach Funds. PB Management LP served as the general partner in PBFP and PBFII. HARROLD and PREVOST were the controlling owners and only executive officers of PBFP, PBFII, PB Management LLC, and PB Management LP. In this

3

U.S. v. Frank Elroy Vennes, Jr., et al.

Indictment, the Palm Beach Funds, PREVOST, HARROLD, the investment manager (PB Management LLC), and the general partner (PB Management LP) are referred to collectively as "Palm Beach."

10. Defendant FRANK ELROY VENNES, JR., was a business associate of Thomas J. Petters. Starting in or about 1995 and continuing until in or about September, 2008, VENNES raised money from investors to invest in PCI. VENNES was the principal of, and did business through, Metro Gem, Inc. VENNES raised money directly from investors with which PCI Notes were purchased. VENNES also raised money by inducing large hedge funds to raise money from investors and then use that money to purchase PCI Notes.

11. In approximately 2002, VENNES recruited HARROLD and PREVOST to raise money for Petters and PCI. VENNES introduced HARROLD and PREVOST to Petters. VENNES told HARROLD and PREVOST that he had negotiated and arranged financing for PCI for eight years, describing himself as Petters' "financier," and said that Petters had requested that VENNES act on Petters behalf in structuring financing arrangements for PCI.

12. VENNES told HARROLD and PREVOST that he knew Petters' business "intimately." VENNES explained to HARROLD and PREVOST how the PCI purchase order financing mechanism purportedly operated and VENNES told HARROLD and PREVOST that he had in the past conducted

4

U.S. v. Frank Elroy Vennes, Jr., et al.

"due diligence" on PCI.  Among other things, VENNES told HARROLD and PREVOST:

a.   That before investing in a PCI deal, VENNES would contact the supplier of the goods purportedly being sold;

b.   That before investing in a PCI deal, VENNES would contact the alleged purchaser of the goods purportedly being purchased; and

c.   That before investing in a PCI deal, VENNES would verify that the shipping process had been arranged, that the products were ready for shipment, had verified that a copy of the Bill of Lading had been received, had verified that the entire shipment was insured, and had checked the terms of the purchase order for accuracy.

13.  VENNES further instructed HARROLD and PREVOST in detail as to how they should structure the Palm Beach Funds and how the Palm Beach Funds' PCI transactions should operate.  VENNES also advised HARROLD and PREVOST that VENNES had an agreement with Petters that all communications with Petters and PCI had to go through VENNES.

14.  In or about November of 2002, HARROLD and PREVOST invested the first of the Palm Beach Funds' investor monies in PCI Notes.  From 2002 through September 2008, in approximately 2,100 investment transactions, the Palm Beach Funds invested

5

U.S. v. Frank Elroy Vennes, Jr., et al.

approximately eight billion dollars in PCI Notes. PREVOST and HARROLD invested substantially all the funds raised from the Palm Beach investors in PCI Notes. The Palm Beach Funds remained invested in PCI through September 24, 2008. As of September 24, 2008, more than one billion dollars of Palm Beach Funds' investors' money was in PCI.

15. From 2002 through September 2008, PREVOST, HARROLD, PB Management LP, and PB Management LLC grossed more than $58 million in fees under their agreements with the Palm Beach Funds.

16. Consistent with the understanding VENNES communicated to HARROLD and PREVOST when they began investing the Palm Beach Funds' investor monies with PCI, all documentation for transactions between the Palm Beach Funds and PCI (for example, promissory notes and security agreements) was required to go through VENNES or one of his employees. In addition, substantially all communication between PCI/Petters and Palm Beach also went through VENNES or one of his employees. In exchange for his services, PCI and/or Petters paid a commission to VENNES. This commission was calculated as a percentage of the funds raised by VENNES for Petters and PCI. Between 2003 and 2008 VENNES obtained more than $60 million in commissions related to the Palm Beach Funds investment. VENNES had a similar arrangement with another hedge fund, from which he

U.S. v. Frank Elroy Vennes, Jr., et al.

obtained more than $45 million in commissions on money he raised for PCI.

### The Flow of Funds Misrepresentations

17.   Defendants, aiding and abetting each other, and being aided and abetted by each other, both verbally and in written materials, made false representations to investors in the Palm Beach Funds.  Specifically, HARROLD, PREVOST, and VENNES made, or caused to be made, false representations to investors that when a retailer purchased consumer electronics or other goods from PCI, in a transaction that was financed by the Palm Beach Funds, the "Big Box" retailer made payment for those goods directly to the Palm Beach Funds.  In truth and in fact, the Palm Beach Funds received all their "payments" for the purported consumer goods from PCI and not from the retailers who were purportedly buying the goods being financed.

18.   The representation that payment was received directly from retailers was false and the defendants knew it.  During the period from 2003 through September 24, 2008, no funds were transferred by retailers to the Palm Beach Funds.  The defendants knew the Palm Beach Funds always received payments from PCI, not directly from the retailers.  The misrepresentation that the Palm Beach Funds were paid by the retailers, and not by PCI, was material to investors in the Palm Beach Funds because it prevented

U.S. v. Frank Elroy Vennes, Jr., et al.

investors from accurately assessing investment risk in two ways. First, the misrepresentation that funds were being received from retailers falsely assured investors that genuine transactions were taking place. Second, it falsely assured investors that PCI was unable to misappropriate investors' money. VENNES caused, encouraged and induced PREVOST and HARROLD to make these misrepresentations, which all the defendants knew to be false.

### Material Misrepresentations About PCI's Failure to Pay

19.  The PCI Notes held by the Palm Beach Funds were due in 90 days, and went into default if not paid within 182 days.  PCI had historically paid the notes in approximately 90 days.   PCI's payment status and the relative payment status of the PCI Notes held by Palm Beach were material to Palm Beach investors.

20.  In late 2007 and early 2008 the PCI Notes held by the Palm Beach Funds began extending beyond 90 days without payment. By February 2008, millions of dollars of PCI Notes were on the verge of going into default.  This information was material to investors, but was not communicated to investors by VENNES, HARROLD, or PREVOST.

21.  Instead of advising investors about the delayed payments and the approaching note defaults, in or about February 2008 VENNES proposed to HAROLD and PREVOST a "note swap" arrangement, in which they would exchange the notes which were on the verge of defaulting

<u>U.S. v. Frank Elroy Vennes, Jr., et al.</u>

with other PCI Notes which had later maturity dates.  Beginning in or about February 2008, HARROLD and PREVOST, through VENNES, engaged in over 35 "note swap" transactions. These transactions represented over 250 individual PCI Notes with a total value of approximately one billion dollars.  They created the appearance that the PCI Notes had not defaulted, and were intended to conceal PCI's inability to pay.

22.  Pursuant to the "note swap" arrangement, after PCI delayed paying principal and accrued interest on mature notes, the Palm Beach Funds, on multiple occasions, exchanged groups of notes that were within days of defaulting for newly-issued PCI Notes that would not default for approximately six months and that purported to be collateralized by different merchandise.   Instead of receiving cash payments and then reinvesting that cash in new PCI Notes as they had done in the past, HARROLD and PREVOST, aided and abetted by VENNES, simply exchanged old PCI Notes for new ones, in a cashless exchange of paper.  Documentation for all note swaps was arranged by, and run through, VENNES.

23.  At the same time, HARROLD and PREVOST continued to report, in monthly communications to investors, that the funds were generating the same steady profits that they had generated from their inception.   These monthly communications were materially misleading because the defendants omitted to advise investors that

U.S. v. Frank Elroy Vennes, Jr., et al.

the method of calculating profits had changed significantly in that profits were no longer calculated based on actual cash received in payment of the PCI notes, but rather that those profit calculations were now based on treating new notes from PCI as equivalent to actual cash.    These new notes were purportedly secured by collateral being sold by the same retailers who were allegedly not paying their existing financial obligations. The misrepresentation to investors that PCI was paying its notes when due, when in fact the Palm Beach Funds were simply receiving "paper payments" in the form of new notes with later maturity dates, secured by collateral held by the same retailers who were not paying the old notes, was material.

     24.    After the "note swap" arrangement began, VENNES encouraged and induced HARROLD and PREVOST to solicit money from new investors, as well as additional money from existing investors, for PCI Notes.    From on or about February 20, 2008, when the "note swaps" began, until on or about September 24, 2008, PREVOST and HARROLD, aided and abetted by VENNES, raised more than $75 million in new investor money from more than 30 investors.

U.S. v. Frank Elroy Vennes, Jr., et al.

## COUNTS 1-4
(Securities Fraud)

25. The Grand Jury hereby realleges and incorporates paragraphs 1 through 24 of this Indictment as if stated in full herein.

26. From in or about 2002 through and including on or about September 24, 2008, in the State and District of Minnesota and elsewhere, the defendants,

**FRANK ELROY VENNES, JR.,
DAVID WILLIAM HARROLD, and
BRUCE FRANCIS PREVOST,**

each aiding and abetting one another, and being aided and abetted by one another, did knowingly and deliberately, offer and sell securities and, by the use of means and instrumentalities of interstate commerce, directly and indirectly, employed a scheme and artifice to defraud, obtained money by means of untrue statements of material fact and omissions of material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaged in a transaction, practice or course of business which operated as a fraud or deceit upon the purchaser of securities, as set forth in paragraphs 17 through 24 above, in violation of Title 15, United States Code, Sections 77q(a) and 77(x).

11

U.S. v. Frank Elroy Vennes, Jr., et al.

27.  On or about the dates set forth below, in the State and District of Minnesota and elsewhere, the defendants,

**FRANK ELROY VENNES, JR.,**
**DAVID WILLIAM HARROLD, and**
**BRUCE FRANCIS PREVOST,**

aiding and abetting each other, and being aided and abetted by each other, for the purpose of executing the securities fraud set forth above, made, or caused to be made, the following communications to the following investors and potential investors:

| Count | Date (on or about) | Material Misrepresentation Made to | Nature of Material Misrepresentation |
|-------|--------------------|-----------------------------------|--------------------------------------|
| 1 | April 9, 2008 | J. D. | Private Placement Memorandum Falsely Describing Flow of Funds |
| 2 | May 28, 2008 | S.A. | False March and April Fund Performance Statistics |
| 3 | June 12, 2008 | A.F. | Telephone call in which investor is told retailer pays Palm Beach for PCI Notes |
| 4 | April 1, 2008 | M.B. | Telephone call in which investor is told retailer pays Palm Beach for PCI Notes |

All in violation of  Title 15, United States Code, Sections 77q(a) and 77(x), and Title 18, United States Code, Section 2.

12

U.S. v. Frank Elroy Vennes, Jr., et al.

## COUNT 5
(Money Laundering)

28. The Grand Jury hereby realleges and incorporates paragraphs 1 through 27 of this Indictment as if stated in full herein.

29. On or about September 4, 2008, in the State and District of Minnesota and elsewhere, the defendant,

**FRANK ELROY VENNES, JR.,**

knowingly engaged and attempted to engage in a monetary transaction affecting interstate commerce, in criminally-derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, securities fraud, namely the issuance of a check in the amount of $98,814.12 payable to the law firm of Howse & Thompson, P.A.

All in violation of Title 18, United States Code, Section 1957.

## FORFEITURE ALLEGATIONS

Counts 1 through 4 are hereby realleged as if fully stated herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

13

U.S. v. Frank Elroy Vennes, Jr., et al.

As the result of the offenses alleged in Counts 1 through 4 of this Indictment, the defendants shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violations of Title 15, United States Code, Sections 77q(a) and 77(x).

If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

Count 5 is hereby realleged as if fully stated herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(1). If convicted of Count 5, the defendant shall forfeit to the United States any and all of his right, title, and interest in any and all real or personal property involved in any violation of Count 5, as well as any property traceable to such property.

If any property described above is unavailable for forfeiture as described in Title 21, United States Code, Section 853(p), the United States will forfeit substitute property pursuant to Title 21, United States Code, Section 853(p) as incorporated by Title 28,

U.S. v. Frank Elroy Vennes, Jr., et al.

United States Code, Section 2461(c) and Title 18, United States
Code, Section 982(b)(1).

A TRUE BILL

_____          _____
UNITED STATES ATTORNEY                    FOREPERSON

15